UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JESUS MIGUEL VILLARREAL,

                Petitioner,

    v.

PATRICK GLEBE,

                Respondent.

Case No. C14-5358 RJB-KLS

**REPORT AND RECOMMENDATION**
**Noted For: August 22, 2014**

      Petitioner Jesus Miguel Villarreal seeks 28 U.S.C. § 2254 habeas relief from his 2010 conviction by jury verdict of possession of methamphetamine with intent to deliver in a school zone.  Dkt. 6.  He raises nine grounds for relief: illegal stop, search and seizure; lack of due process during suppression hearing; wrongful denial of suppression motion; insufficient evidence; wrongful admission of irrelevant expert testimony; unconstitutionality of school zone statute as applied; and, prosecutorial misconduct.  *Id.*

      The Court recommends **DENYING** the habeas petition as Mr. Villarreal has failed to demonstrate that the state court adjudication of his claims was contrary to, or an unreasonable application of, established federal law, or was an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d)(1)–(2).  The Court also recommends **DENYING** an evidentiary hearing and the issuance of a certificate of appealability.

REPORT AND RECOMMENDATION - 1

# BACKGROUND

**A.    Facts**

The Washington Court of Appeals summarized the facts of Mr. Villarreal's case as follows:

## FACTS

### I. SUPPRESSION HEARING

After Villarreal's May 25, 2010 arrest, the State charged him with unlawful possession of methamphetamine with intent to deliver, plus a school grounds aggravating factor. Villarreal moved before trial to suppress evidence obtained subsequent to his detention by law enforcement officers.

Kelso Police Department Sergeant Kevin Tate testified at the suppression hearing. According to Tate, on May 25, 2010, at approximately 9:00 or 10:00 PM, the Cowlitz-Wahkiakum Task Force conducted a controlled buy of methamphetamine at the 99 Home Court residence of Victoria Oretega-Berrara. Afterward, Tate returned to the Kelso Police Department to author search warrant affidavits. Other law enforcement officers kept the residence under surveillance until Tate could obtain a warrant.

Tate testified that, at some point between 10:00 PM and 1:00 AM, surveillance officers informed him that someone who "looked like a male" had "left the house," accessed a truck in the residence's driveway, removed an object from the truck, and began walking away. Report of Proceedings (RP) at 6-8. Based on concerns that anyone leaving the residence might remove evidence related to the investigation, flee, or compromise the investigation by discovering surveillance, Tate "directed that someone" contact Villarreal. RP at 5-9.

According to Longview Police Department Detective Kevin Sawyer, Tate directed him around midnight to contact the individual. Sawyer knew of the ongoing investigation, and his understanding was that surveillance units had seen someone "leav[e] the residence" and retrieve a "bag or an item" from a vehicle in the driveway. RP at 13, 17-18. Surveillance units maintained visual contact with Villarreal and guided Sawyer to his location "a couple hundred yards" or about "two blocks" away from the residence. RP at 17, 25. Sawyer's patrol car was an unmarked, "white Crown Vic," but was "obviously" recognizable as a "police car" because of its antennas, "push bumper," and spotlight. RP at 14-15. As Sawyer approached in his patrol car, Villarreal looked back directly at Sawyer, made eye contact with him, immediately set a "computer bag" down behind a dumpster, and continued walking away. RP at 14.

REPORT AND RECOMMENDATION - 2

Suspecting that either Villarreal was removing evidence related to the investigation from the residence or had stolen the bag, Sawyer activated his patrol car's emergency lights and contacted him. Villarreal continued walking away, so Sawyer exited his vehicle, identified himself, ordered Villarreal to stop, and asked about Villarreal's activities and the bag. After initially stating that he was doing "nothing" and did not know what bag Sawyer was asking about, Villarreal admitted that the bag belonged to him. RP at 18-19. Sawyer asked Villarreal whether anything in the bag could identify him as its owner; Villarreal said "Yes," and told Sawyer he could search the bag. RP at 18-19. Sawyer informed Villarreal that he did not have to consent to the bag's search and again asked to search the bag, to which Villarreal consented.

Inside the bag, Sawyer discovered three plastic baggies containing 12.9 grams, 20 grams, and 1.4 grams of methamphetamine. Sawyer then read Villarreal his Miranda$^3$ rights; Villarreal waived his rights and stated that he was a drug user, the drugs in the bag belonged to him, and the drugs were for his personal use.

.      According to Villarreal's friend, Holly West, Villarreal came to her house at 2:00 AM to "catch up" and asked whether she wanted to walk down the street to pick up his bag. RP at 28-30. They walked to a residence, Villarreal retrieved his bag from the truck, and he knocked on the residence's door, but did not enter.

The trial court denied Villarreal's suppression motion. The trial court orally found that it was "not clear" whether Villarreal had left the residence itself or just its driveway and that he had left the residence "somewhere between midnight and two in the morning." RP at 58. Nonetheless, it found that he had retrieved the bag from a vehicle in the driveway of a residence where a "large drug transaction" had occurred "[w]ithin a couple of hours." RP at 58. The trial court orally concluded that these facts justified Villarreal's investigative detention and that Villarreal consented to Sawyer's search of his bag.

After both parties filed their briefing in this case, we remanded to the trial court for entry of written findings of fact and conclusions of law and allowed the parties to submit additional briefing. The trial court entered the following findings of fact:

1.   The incident occurred on May 25, 2010 in the City of Kelso, Cowlitz County, State of Washington.
2.   On May 24th, 2010, between 9pm and 10pm, the Cowlitz-Wahkiakum Narcotics Task Force conducted a controlled-buy operation involving a large amount of methamphetamine from Victoria Ortega-Barrerra at 99 Home Court, Kelso, Washington.
3.   The Task Force left detectives in surveillance at the 99 Home Court address while Detective Sgt. Kevin Tate went to draft a search warrant for that residence, as well as another involved

REPORT AND RECOMMENDATION - 3

> residence.
> 4.   Sometime between midnight and two am, surveillance detectives at 99 Home Court observed a male enter a truck parked in the driveway of the residence, retrieve a bag of some sort, then leave the area.
> 5.   Detective Kevin Sawyer of the Longview Police Street Crimes Unit was detailed to stop and question the person that had entered the truck.  Surveillance units kept constant visual contact of the person and guided Detective Sawyer to his location.
> 6.   The person in question was later identified as Jesus VILLARREAL.
> 7.   Detective Sawyer observed VILLARREAL look up and make eye contact with him as he approached in his unmarked white Crown Victoria.  Detective Sawyer observed VILLARREAL place, seemingly in response to the eye contact, a black bag behind a garbage can on the sidewalk where he was standing.
> 8.   Detective Sawyer contacted VILLARREAL, who was standing with a female unrelated to the investigation  He asked him what was "going on," and VILLARREAL said "nothing."  When Sawyer asked about the bag, VILLARREAL replied he did not know anything about the bag.  Sawyer asked him again about it and whether the bag was his or stolen.  VILLARREAL admitted the bag was his and that he had set the bag down.  He also admitted that there were things in the bag that would identify him and told Sawyer that he could check it if he wanted.  Sawyer picked up the bag and asked VILLARREAL again if it was okay to search it and told him that he had a right to refuse.
> 9.   Detective Sawyer searched the bag and found approximately 34 grams of methamphetamine.

Supp. Clerk's Papers (Supp. CP) at 1-2.  The trial court entered the following conclusions of law:

> 1.   There was sufficient evidence of criminal activity to support a limited <u>Terry</u> detention of VILLARREAL, based on the prior large drug transaction at 99 Home Court, the time of day that VILLARREAL was seen entering the vehicle in the driveway there, and the behavior of attempting to hide the bag he took from 99 Home Court when he spotted Detective Sawyer.
> 2.   VILLARREAL knowingly and intelligently consented to the search of the bag and the circumstances surrounding that consent were not coercive.

Supp. CR at 2.

REPORT AND RECOMMENDATION - 4

## II. TRIAL

At trial, Department of Corrections Officer Dustin Pratt testified about being part of the surveillance unit for Ortega-Berrara's residence on May 25, and observing Villarreal "[going] up to the residence," removing a bag from the vehicle, and walking away. RP at 79-82. According to Pratt, Villarreal was observed by surveillance officers after leaving the residence until he was contacted by a patrol car.

Sawyer testified consistent with his suppression hearing testimony. In addition, he testified that he discovered a police scanner in Villarreal's bag and $1,750 in cash on Villarreal's person, but did not discover any packaging materials, scales, transaction ledgers, or customer lists. According to Sawyer, a normal, single usage amount of methamphetamine was 0.2 grams; the typical amount of methamphetamine possessed by users was between 0.2 and 1.77 grams; and, in his training and experience, he had never encountered anyone in possession of 34.3 grams – the amount possessed by Villarreal – for personal use. Finally, Sawyer testified that the distance between Villarreal's arrest and the perimeter of a local school's grounds measured less than 1,000 feet.

Longview Police Department Detective Timothy Watson also testified as an expert witness on the methamphetamine trade. According to Watson, methamphetamine is generally smuggled into the area from Mexico in pound or quart quantities and broken down into ounces or various fractions of an ounce for dealers. Dealers usually possess one-eighth of an ounce or more of methamphetamine and sometimes use their own supply. Dealers typically do not break down methamphetamine into end user amounts and do not use scales during dealer-to-dealer sales because they could verify the amounts by sight. In Watson's training and experience, individuals were usually found in possession of less than one-eighth of an ounce for personal use, and he had never dealt with anyone in possession of over one-half of an ounce for personal use. Watson opined that non-dealer drug users avoid carrying around large amounts of methamphetamine in order to minimize their risk of being arrested while in possession of it. On cross-examination, Watson testified that drug dealers sometimes possess packaging materials, scales, transaction ledgers, and customer lists and that there would be a stronger inference that someone arrested with both drugs and any of those other items was a drug dealer.

Finally, Villarreal testified that he worked as a mechanic and was typically paid in cash, and the $1,750 in cash he possessed on May 25 was his wages for a week of mechanic work. He also testified that he typically used one-sixteenth to one-eighth of an ounce of methamphetamine per day, he had no intention of selling the methamphetamine he possessed, and the police scanner was a surprise gift from his wife that she delivered earlier on May 25.

REPORT AND RECOMMENDATION - 5

> During closing arguments, the prosecutor repeatedly requested that the jury "look at the evidence you have" and argued, "If it walks like a duck and quacks like a duck, Mr. Villarreal intended to sell those drugs.
>
> ³*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Dkt. 15, Exhibit 2, pp. 2-7.

**B.     State Court Procedural History**

Through counsel, Mr. Villarreal appealed to the Washington Court of Appeals.  Dkt. 15, Exhibit 3.  The Washington Court of Appeals affirmed Mr. Villarreal's conviction and sentence.  *Id.,* Exhibit 2.  Mr. Villarreal filed a motion to reconsider the court's ruling which was denied.  *Id.*, Exhibits 6 and 7.  Mr. Villarreal petitioned for review.  *Id.*, Exhibit 8.  The Washington Supreme Court denied review on October 2, 2013.  *Id.*, Exhibit 11.  The Washington Court of Appeals issued its mandate on October 14, 2013.  *Id.*, Exhibit 12.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case. *Id*. The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). AEDPA requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition, review of state court decisions under 28 U.S.C. § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

## EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, ---U.S.---, 131 S.Ct. 1388 (2011). A hearing is not required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen,* 131 S. Ct. 1388 (2011). The Court finds it unnecessary to hold an evidentiary hearing because Mr. Villarreal's claims may be resolved on the existing state court record.

## DISCUSSION

**A.      Claims 1-5**

In Claims 1, 2, and 3, Mr. Villarreal alleges that the initial stop and search of his bag

REPORT AND RECOMMENDATION - 7

violated his Fourth Amendment rights.  In Claims 4 and 5, Mr. Villarreal contends that the trial court committed error during the 3.6 suppression hearing and in its ruling denying his motion to suppress the evidence found during the search.

The Fourth Amendment assures the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The exclusionary rule is designed to effectuate these rights but is not itself a personal constitutional right.  *Stone v. Powell*, 428 U.S. 465, 482 (1976).   The rule is a judicially created remedial device designed to deter future misconduct by removing the incentive to disregard the Fourth Amendment and evidence obtained in violation of the Fourth Amendment is excluded in the hope that the frequency of future violations will decrease.  *Id*. at 484, 492.  However, where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.  *Id.* at 482.   So long as the state provides the processes whereby a defendant can obtain full and fair litigation – whether or not the defendant avails himself of those processes -- *Stone v. Powell* bars federal habeas corpus consideration of the claim.  *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978); *Siripongs v. Calderon*, 35 F.3d 1308, 1321 (9th Cir. 1994).

The Washington Criminal Rules for Superior Court provide for a full and fair opportunity to litigate Fourth Amendment claims.  *See* CrR 3.6.  The record reflects that Mr. Villarreal was provided an opportunity to litigate the alleged Fourth Amendment violations and in fact, did so.  The trial court conducted a 3.6 hearing and concluded that there was sufficient evidence of criminal activity to support a limited *Terry* detention and that Mr. Villarreal had knowingly and intelligently consented to the search of the bag.  Dkt. 15, Exhibit 2, p. 5.

Although Mr. Villarreal disagrees with the result of the suppression hearing, he had the opportunity and did litigate the issue in state court. Therefore, Claims 1, 2, 3, 4, and 5 are barred by *Stone v. Powell* and should be denied.

**B.     Claim 6 – Insufficient Evidence**

In Claim 6, Mr. Villarreal alleges there was insufficient evidence to support the jury's verdict that he intended to deliver methamphetamine.

When evaluating a claim of insufficiency of the evidence to support a conviction, the question is not whether the Court itself believes the evidence establishes guilt. "Instead, the relevant question is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Court's review is limited to "record evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

A reviewing court must presume that the trier of fact resolved any conflicting inferences in the record in favor of the prosecution and must defer to that resolution. *McDaniel v. Brown,* 558 U.S. 120, 133 (2010) (*quoting Jackson*, at 326). The jury is entitled to believe the State's evidence and disbelieve the defense's evidence. *Wright v. West*, 505 U.S. 277, 296 (1992). A jury's credibility determinations are entitled to "near-total deference under *Jackson*." *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

The state court denied Mr. Villarreal's insufficient evidence claim:

> Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 9, 133 P.3d 936 (2006). On appeal, we draw all reasonable inferences from the evidence in the State's favor and interpret them most strongly against the defendant. *Hosier*, 157 Wn.2d at 8. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific

...

criminal intent of the accused from conduct that plainly indicates such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds, Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Mere possession of a controlled substance, without more, is insufficient to establish possession with intent to deliver. *See, e.g., State v. Hutchins*, 73 Wn. App. 211, 216-17, 868 P.2d 196 (1994); *State v. Brown*, 68 Wn. App. 480, 483, 843 P.2d 1098 (1993); *see also State v. Wade*, 98 Wn. App. 328, 339, 989 P.2d 576 (1999). Likewise, "[a]n officer's opinion of the quantity of a controlled substance normal for personal use" is insufficient to establish intent to deliver. *Hutchins*, 73 Wn. App. at 217. But possession of a large quantity of drugs plus possession of a large amount of cash is sufficient to infer intent to distribute. *State v. Campos*, 100 Wn. App. 218, 223-24, 998 P.2d 893 (2000) (possession of nearly one ounce of cocaine and $1,750 in cash sufficient to demonstrate intent to deliver); *Avendano-Lopez*, 79 Wn. App. at 768-69 (possession of two ounces and 4.7 grams of cocaine and $826.50 in cash sufficient to demonstrate intent to distribute).

Here, Villarreal possessed 34.3 grams of methamphetamine, a large amount that Watson's testimony indicated was more consistent with a dealer than an end user. Additionally, Villarreal possessed $1,750 in cash. Finally, he possessed a police scanner, an item indicating intent to deliver. *See Campos*, 100 Wn. App. at 224 (*citing People v. Robinson*, 167 Ill. 2d 397, 408, 657 N.E.2d 1020 (1995)). Taken together, this evidence sufficiently supported a rational inference that Villarreal possessed the methamphetamine with intent to deliver it. His claim fails.

Dkt. 15, Exhibit 2 at 20-22.

To establish Mr. Villarreal's intent to deliver methamphetamine, the State had to prove more than simple possession of the drug. "Where intent to deliver is inferred from possession of a large quantity of a controlled substance, some additional factor must be present." *State v. Campos*, 100 Wash. App. 218, 222, 998 P.2d 893 (2000).

The evidence established that Mr. Villarreal approached a residence where a large drug buy had occurred shortly before, entered a car parked in the driveway of this same residence, and removed a bag. Upon seeing police he tried to hide the bag behind a garbage can. Inside the bag

was 34 grams of methamphetamine and a police scanner, and Mr. Villarreal had $1,750 in cash on his person.  Dkt. 15, Exhibit 13, Verbatim Report of Proceedings, Volume I, at 132:14-16; 108-110.  Detective Sawyer testified that more than 30 grams of methamphetamine were found in Mr. Villarreal's bag.  *Id*. at 98:7.  Detective Sawyer also testified that the street price of an ounce of methamphetamine is between $1,100 and $1,300 and the "points retail" price for 30.9 grams is approximately $3,000.  *Id*. at 133: 7-24.

At trial, Mr. Villarreal testified that the amount of methamphetamine he had in his possession at the time of his arrest would have lasted him about a month.  *Id.*, Exhibit 14, Verbatim Report of Proceedings, Volume 2, at 185:20-24.  He also testified that the $1,750 cash he had were his wages for mechanical work he had done that week.  *Id.*, at 186:9-14.  According to Mr. Villarreal, he left the bag containing methamphetamine in the truck because he had worked on it earlier that day and he figured "I'd come back later and get it or finish doing what I was doing, but I didn't want to be there while . . . she wasn't there.  So I just left the bag there." *Id*., at 186:21-187:3.  Mr. Villarreal also claimed the police scanner was a gift from his wife which she surprised him with while he was working.  *Id*. at 189:3-8.

The jury was entitled to believe the State's evidence and disbelieve Mr. Villarreal's evidence.  The jury was entitled to disbelieve Mr. Villarreal's explanation that he left approximately $3,000 in methamphetamine in the trunk of someone else's car, he would carry around a month's supply of methamphetamine, and that the money he was carrying was his wages for mechanic work.  Any rational trier of fact could have found beyond a reasonable doubt that Mr. Villarreal intended to deliver the 34 grams of methamphetamine in the bag he was carrying.

REPORT AND RECOMMENDATION - 11

The state court's adjudication of Mr. Villarreal's insufficient evidence claim was not objectively unreasonable and was not an unreasonable application of, or contrary to, clearly established Supreme Court precedent. Therefore, Claim 6 should be denied.

**C.    Claim 7 – Admission of Evidence**

In Claim 7, Mr. Villarreal argues that the trial court abused its discretion in admitting Detective Watson's expert and opinion testimony on methamphetamine dealing, usage and distribution. Mr. Villarreal asserts that Detective Watson's testimony about the "minutiae of the practices" about the habits of street-level drug dealers "created a complete and vivid mental image in the minds of the jury of the methamphetamine distribution chain." Dkt. 6, p. 20. Mr. Villarreal argues it is highly probable that one or more juror associated this evidence with the defendant.

Detective Watson testified regarding how drugs are broken down according to each level of dealer, the terminology used for the different breakdowns of drugs, and the sale price of various amounts of drugs. Exhibit 14, at 153-179. Detective Watson also testified about drug dealers being users themselves and sometimes selling drugs to support their habit. *Id*.

The Washington Court of Appeals rejected Mr. Villarreal's claim that admission of Detective Watson's testimony deprived him of a fair trial:

> Villarreal contends that the trial court abused its discretion in admitting Detective Watson's irrelevant expert testimony on methamphetamine dealing, usage and distribution, and Watson's improper opinion testimony. We disagree. We review the trial court's admission or exclusion of expert testimony for abuse of discretion. *Philippides v. Bernard*, 151 Wn.2d. 376, 393, 88 P.3d 939 (2004).
>
> "An expert's opinion is admissible if the witness is properly qualified, relies on generally accepted theories, and the expert's testimony is helpful to the trier of fact." *Philipides*, 151 Wn.2d at 393. Washington courts have repeatedly held that expert testimony about "the arcane world of drug dealing and certain drug transactions" is admissible. *State v. Avendano-Lopez*, 79 Wn. App. 706, 711, 904 P.2d 324 (1995).

REPORT AND RECOMMENDATION - 12

>       Here, Watson generally testified about the quantities in which methamphetamine is imported, the various quantities into which methamphetamine is broken down for dealer-to-dealer transactions, typical behavior during dealer-to-dealer transactions, and the typical amount of methamphetamine possessed by dealers or end users. Watson's testimony was helpful in explaining to the jury, in the context of methamphetamine dealing and usage, the potential significance of the amount of methamphetamine Villarreal possessed. Accordingly, the trial court did not abuse its discretion in admitting Watson's expert testimony.
>
>       Likewise, Watson did not provide improper opinion testimony. "'[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony.'" *State v. Cruz*, 77 Wn. App. 811, 814, 894 P.2d 573 (1995) (*quoting Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993)). Here, Watson made no direct comments on Villarreal's guilt and placed the evidence within the context of his own knowledge of methamphetamine dealing, information that was useful to the jury.
>
>       Finally, even if the trial court abused its discretion in admitting some portions of Watson's testimony, Villarreal cannot claim prejudice. Villarreal cross-examined Watson to establish that drug dealers sometimes possess packaging materials, scales, transaction ledgers, and customer lists and that there would be a stronger inference that someone arrested with both drugs and any of those other items was a drug dealer. Villarreal also established at trial that he possessed none of these items at the time of his arrest. Having chosen to use Watson's expertise to his advantage at trial, Villarreal cannot claim error on appeal. *Avendano-Lopez*, 79 Wn. App. at 711-12; *see also State v. Cunningham*, 93 Wn.2d 823, 832-33, 613 P.2d 1139 (1980). His claim fails.

Dkt. 15, Exhibit 2, at 19-20.

During cross-examination, Detective Watson testified that many times drug dealers carry pay owe sheets, transaction ledgers and packaging materials and their cell phones ring frequently. *Id.*, Exhibit 14, at 168-169. Mr. Villarreal did not possess any of these items and his cell phone never rang when he was stopped by Detective Sawyer, and he was able to argue this lack of evidence at trial:

>       The testimony was that my client's phone didn't ring during that contact because I know for a fact if his phone had rang, it would have hit up in the police report and it would have been presented to you as evidence that my client was a

REPORT AND RECOMMENDATION - 13

    drug dealer. . . .

    We typically see what are called pay owe sheets, which is a ledger that says, I fronted you this money, here's how much I got back and, okay, your balance is now this, and it's an ongoing business transaction. . . .

    My client has an ounce of methamphetamine on him and no pay or owe sheet. Nowhere in the paper work or any of the things that was in his bag when they tossed his bag and searched his pockets, were any pay and owe sheets or any scales or any packaging material. No way for him to actually conduct business with the methamphetamine that he purchased.

Dkt. 15, Exhibit 14, at 214-215.

    A state court's evidentiary rulings are not a proper subject for federal habeas corpus review. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (holding that state court admissibility and foundational rulings raise no federal habeas issues). In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id*. (*citing* 28 U.S.C. § 2241). The admission of evidence does not provide a basis for habeas relief unless it rendered the trial "fundamentally unfair" in violation of due process. *Id*. at 67-69; *see also Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995).

    Thus, to the extent Mr. Villarreal argues that the admission of Detective Watson's testimony was in violation of Washington's evidentiary rules, his claim is not cognizable on federal habeas review because it does not present a federal question. As noted above, the admission of evidence does not provide a basis for habeas relief unless it rendered the trial "fundamentally unfair." Mr. Villarreal contends that the testimony was prejudicial. However, he is not entitled to relief unless admission of the testimony had a substantial or injurious effect or influence in determining the jury's verdict. A review of the record reveals that it did not have

REPORT AND RECOMMENDATION - 14

such an effect. The testimony was not offered as an opinion of Mr. Villarreal's guilt or credibility, the testimony was useful to the jury's understanding of other testimony (regarding the amounts of methamphetamine, the significance of those amounts, the street price and the point retail price of the drugs), and there was sufficient evidence other than the detective's testimony, with which to convict Mr. Villarreal of possession of methamphetamine with intent to distribute.

The state court's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law and therefore, Claim 7 should be denied.

**D.   Claim 8 – School Zone Statute**

In Claim 8, Mr. Villarreal contends that Washington's school zone statute, RCW 69.50.435, is unconstitutional as applied to the facts of his case because there was no suspicion or evidence that the school zone was a destination chosen by him, that he did not voluntarily stop there but was merely passing through the school zone at 2 a.m. when there were no school children present. Dkt. 6, p. 21. Respondent contends that these claims should be denied because they involve solely state law matters. Dkt. 14, p. 22.

The Washington Court of Appeals rejected this claim:

> Villarreal finally argues that RCW 69.50.435(1)(d), the school grounds sentencing enhancement statute, is unconstitutional as applied to him. We choose to discuss his claim, even though his preservation of the issue is slight and his discussion is minimal.
>
> First, Villarreal fails to specify what constitutional provision the sentencing enhancement violates and what type of constitutional challenge he brings. His briefing instead focuses on the legislative intent[9] underlying the statute. But RAP 10.3(a)(6) requires appellants to support assignments of error with relevant argument and authority. Moreover, "[p]arties raising constitutional issues must present considered arguments to this court." *State v. Johnson,* 119 Wn.2d 167, 171, 829 P.2d 1082 (1992). "[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *Johnson,* 119 Wn.2d at 171 (internal quotation marks omitted) (quoting *In re Request of Rosier,* 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)). And "we are not in the business of inventing unbriefed arguments for parties sua sponte." *State v.*

REPORT AND RECOMMENDATION - 15

> *Studd,* 137 Wn.2d 533, 547, 973 P.2d 1049 (1999). Thus, his briefing is insufficient because he does not address the nature of the alleged constitutional violation.
>
> Nevertheless, it appears that Villarreal makes an equal protection challenge. But our Supreme Court has rejected such a challenge to RCW 69.50.435(1)(c), the school bus route stop sentencing enhancement statute. *State v. Coria,* 120 Wn.2d 156, 173, 175, 839 P.2d 890 (1992). In doing so, the *Coria* court reasoned:
>
>> It is no doubt true that children are present at school bus route stops only at specific times. Nonetheless, if drug dealers were allowed to become established near the stops, then it would be impossible to keep them away from those locations only when children are actually present. To keep the dealers away from the stops at specific times, if may rationally be supposed that it is necessary to keep them away from the stops at all times. The statute's classificatory scheme may thus be viewed as an instrument, although perhaps a blunt one, furthering its end. The classification is not "purely arbitrary", as it would have to be if this court were properly to strike it down under the rational basis test.
>
> *Coria,* 120 Wn.2d at 173 (quoting *Omega Nat'l Ins. Co. v. Marquardt,* 115 Wn.2d 416, 431, 799 P.ed 235 (1990)). Likewise, the *Coria* court's reasoning applies to school grounds enhancements under RCW 69.50.435(1)(d); although children may not be always present on or around school grounds, the legislature may rationally conclude that keeping drug dealers away from school grounds at all times is necessary to keep them away at specific times. Accordingly, to the extent Villarreal challenges RCW 69.50.435(1)(d) on equal protection grounds, his challenge fails.
>
> [9] Villarreal cites *United States v. Coates,* 739 F.Supp. 146 (S.D.N.Y. 1990), for the proposition that a federal court found a similar school zone sentencing enhancement statute "unconstitutional as applied." Br. of Appellant at 28. But the *Coates* court held that, based on the statute's legislative intent, it did not apply to the facts in that case. *Coates,* 739 F.Supp. at 152-53. Because the *Coates* court determined that the sentence enhancements should be dismissed on grounds of statutory interpretation, it declined to reach the appellant's constitutional overbreadth challenge. *See Coates,* 739 F. Supp. at 153 n. 1. Accordingly, *Coates,* as a federal statutory interpretation, is inapplicable here.

Dkt. 15, Exhibit 2, pp. 22-24.

A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (*citing Estelle v. McGuire*, 502 U.S. 62, 67–68

REPORT AND RECOMMENDATION - 16

(1991)). In addition, the state court's adjudication of Mr. Villarreal's equal protection claim was not contrary to, or an unreasonable application of, clearly established federal law and therefore, Claim 8 should be denied.

E.   **Claim 9 – Prosecutorial Misconduct**

In Claim 9, Mr. Villarreal argues that the prosecutor committed misconduct during closing argument by misleading the jury as to the presumption of innocence. Mr. Villarreal claims the prosecutor "repeatedly suggested that Mr. Villarreal had not proved his innocence."

The record reflects that defense counsel did not object to the any of the prosecutor's closing argument. In addition, the prosecutor told the jury specifically that the "state" had to prove Mr. Villarreal possessed methamphetamine that he intended to deliver to another person. Dkt. 15, Exhibit 14, p. 202:9-11. At no time during closing argument did the prosecutor tell the jury that Mr. Villarreal had to prove his innocence.

Improper argument is not a per se constitutional violation. *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994). The relevant inquiry is whether the prosecutor's comments so infected the trial with unfairness as to make the resultant conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Even overzealous or obnoxious conduct by a prosecutor does not warrant federal habeas relief.

Where a prosecutor's comments are improper, the petitioner is not entitled to relief unless the comments had "'a substantial and injurious effect or influence' on the jury's verdict." *Burks v. Borg*, 27 F.3d 1424, 1431 (9th Cir. 1994) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). There is no error where there is a failure to object and the misconduct could have been resolved by timely objection. *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988).

The Washington Court of Appeals denied Mr. Villarreal's claim that the prosecutor's argument was improper:

> Villarreal contends that the prosecutor misstated the presumption of innocence and committed misconduct during closing by arguing that "if it walks like a duck and quacks like a duck, . . . Mr. Villarreal intended to sell [those] drugs." Br. of Appellant at 29-31.
>
> A defendant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). A prosecutor has wide latitude to comment on the evidence introduced at trial and to draw inferences from that evidence. *Fisher*, 165 Wn.2d at 747.
>
> In making his argument, the prosecutor requested that the jury "look at the evidence you have." RP at 230. Accordingly, the prosecutor merely argued that the evidence demonstrated an inference that Villarreal possessed the methamphetamine with intent to deliver. Such an argument was proper, and Villarreal's claim fails.

Dkt. 15, Exhibit 2, at 22.

Mr. Villarreal did not object to any of the prosecutor's closing argument. Dkt. 15, Exhibit 13, pp. 202-231. The prosecutor informed the jury it was the state's burden to prove Mr. Villarreal's guilt. *Id.*, Exhibit 14, p. 202. The prosecutor told the jury the evidence established Mr. Villarreal's guilt and it was on that basis the prosecutor asked the jury to return a guilty verdict. *Id.*, Exhibit 14, at 210. The state court's adjudication of this issue was not contrary to, or an unreasonable application of, clearly established federal law and therefore, Claim 9 should be denied.

## CERTIFICATE OF APPEALABILITY

If the district court adopts the Report and Recommendation, it must determine whether a certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A COA may be issued only

where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court recommends that Mr. Villarreal not be issued a COA. No jurist of reason could disagree with this Court's evaluation of his habeas claims or would conclude that the issues presented deserve encouragement to proceed further. Mr. Villarreal should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends **DENYING** Mr. Villarreal's habeas petition on the merits without an evidentiary hearing, and **DENYING** the issuance of a certificate of appealability.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 22, 2014**, as noted in the caption.

DATED this  11th  day of August, 2014.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19